## Styer v. Harleysville Mutual Casualty Co.

*Stanford S. Hunn*, for plaintiff.

*William H. Pugh, IV*, for defendant.

DITTER, J., September 7, 1965.—This is a suit against an insurance company in which damages are claimed because of its refusal to defend a trespass action. It was tried without a jury, and although the trial judge found in favor of defendant, he ordered the matter argued before the court en banc as though on plaintiff's motion for judgment n.o.v.

The facts are not in dispute. At all times relevant to this case, plaintiff was engaged in the business of manufacturing and installing ice cream cabinets on motor vehicles. Some time prior to July 23, 1959, plaintiff entered into an agreement with a man named Richard Hartung, under the terms of which Hartung was to purchase a refrigerated cabinet for a truck which he owned. The particular item desired by Hartung was not in stock, so that it was necessary for plaintiff to order it specially. In the meantime, it was agreed that

Hartung would borrow a cabinet belonging to plaintiff. Mr. Hartung drove to plaintiff's place of business, and plaintiff placed the cabinet on his truck. About a month later, Hartung, while driving from New Jersey toward plaintiff's plant, was involved in an automobile accident. The refrigerated cabinet belonging to plaintiff was thrown from the truck, landing on Hartung, as a result of which he died.

Hartung's estate retained counsel, who entered suit against plaintiff on the grounds that he had failed to fasten the refrigerated cabinet in an adequate manner, thus contributing to the cause of Hartung's death. Plaintiff notified Harleysville, his liability insurer, of the action, but Harleysville declined to defend plaintiff, contending that the accident was not covered by the terms of its policy with plaintiff.

Plaintiff then engaged his own counsel to defend him in the suit by Hartung's executrix. The matter was settled, and as part of that settlement plaintiff contributed $1,000 to Hartung's estate. Counsel fees and costs paid by plaintiff to his attorney amount to $1,032, and the instant suit was brought against Harleysville to recover these two items of expense, legal costs and fees and the amount paid by way of settlement. The trial judge found in favor of Harleysville.

Insurance policies are contracts. It is common practice for insurance companies to mold them out of three components:

1. *The Insuring Agreement:* A general statement which sets forth the undertaking of the insurer for the policyholder;

2. *The Exclusions:* A series of limitations or statements of specific risks for which there is no coverage; and

3. *The Conditions:* A series of definitions, requirements, explanations and basic assumptions.

In addition, it is common to attach endorsements, or

riders, to the basic three-part policy. The rider changes the basic policy by amending one or more of its three primary components, or it may limit coverage, or it may provide additional coverage through being a separate policy, complete in itself.

To all of this, there is attached one or more pages of "Declarations", which identify the insured, his broker, the endorsements and the type of coverage provided by the policy. The grand total is a series of pages, printed in small type, full of technical phrases, difficult language and concepts foreign to all but insurance experts. In many instances, a given policy, as delivered to the insured, contains a vast torrent of words not a part of the company's agreement, because nonapplicable provisions are not physically removed.

In Gutenberg's day, when printing costs were high, there may have been sound reason for using one form for an infinite combination of insuring agreements, exclusions and conditions. The reason no longer exists, however, and the obvious evils suggest that the practice persists only to befuddle, mislead and overwhelm the policyholder who embarks on the perilous venture of reading his policy, blandly and piously prescribed in prominent type by most companies.[1] "One of the most hateful acts of the ill-famed Roman tyrant, Caligula, was that of having the laws inscribed upon pillars so high that the people could not read them. . . .

"Diminutive type grossly disproportionate to that used in the face body of a contract cannot be ignored; it has its place in law, and, where space is at a premium, it allows for instruction, guidance, and protection

---

[1] Just how much good it does to read a policy was indicated by one of Harleysville's supervisors as he testified at the hearing in this matter: "In any hypothetical case it is difficult to say whether there is any coverage or not . . . You can't make a blanket yes or no statement to almost anything, because the policy conditions and exclusions would have an effect on it": N. T. 17.

which might otherwise be lost, but where it is used as an ambush to conceal legalistic spears to strike down other rights agreed upon, it will receive rigorous scrutinization by the courts for the ascertainment of the true meaning which may go beyond the literal import": Cutler Corporation v. Latshaw, 374 Pa. 1, 6-7 (1953). The same rationale applies to the practice of smothering and concealing applicable provisions by surrounding them with those which are not pertinent.

I. COVERAGE UNDER THE BASIC POLICY.

In the instant case, there is a basic policy. It is entitled, "Manufacturers' and Contractors' Liability provisions, 'Part I,' " and it is preceded by a cover and five other pages, two of which are declarations and three of which are endorsements.

The basic policy has this insuring agreement:

"Defendant . . . Agrees with the Insured . . . To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the hazards hereinafter defined". . .

The first "hazard" for which coverage is provided is defined as "the ownership, maintenance or use of premises and *all operations*". (Italics supplied.) Although "operations" is not defined in the policy, it obviously refers to those things which plaintiff does in the conduct of his business. Since his furnishing of the refrigerated box to Hartung was for business purposes, his placement of this box upon the truck would be a part of the "operation" of his business.

However, defendant maintains that the first "Exclusion" limits its coverage to accidents which take place on plaintiff's premises. It contains these words:

"This policy does not apply (a) . . . to the ownership, maintenance, operation, *use, loading or unloading*

of . . . (2) automobiles if the accident occurs away from such premises or the ways immediately adjoining . . ." (Italics supplied.)

The phrase "Ownership, Maintenance, Operation, Use, Loading or Un-loading" is one that is well known to insurance companies and to the courts. It is used both in insuring agreements and in exclusions. It has been the subject of numerous cases, articles and comments by text-writers.[2]

Despite what might seem to be a glut of verbiage in the policy, Harleysville did not define the meaning to be attributed to these words. Thus, we may assume they were intended to be construed in light of current judicial interpretation. A review of the authorities indicates that "loading and unloading" cases are concerned with delivery operations, i.e., when deliveries start and stop, what associated acts by a delivery man are to be included within the concept of the "loading or unloading" of a truck, and to what extent an insurance company should be liable for negligent delivery operations.[3]

---

[2] 7 Appleman, Insurance Law and Practice, 128, etc., and 7 Am. Jur. 2d, Automobile Insurance 392, §87. In Wheeler v. London Guarantee & Accident Co., 292 Pa. 156 (1928), it was held that the "unloading" of a truck had not been completed until a heavy steel girder was dragged inside a building. In Ferry v. Protective Indemnity Company of New York, 155 Pa. Superior Ct. 266 (1944), and in Washington Assurance Corporation v. Maher, 31 Del. Co. 575 (1942), consideration was given to the word "loading". Additional cases are collected in 95 ALR 2d 1122, which also contains a listing of law review articles on the subject and which supplements 160 ALR 1259.

In Manufacturers Casualty Insurance Company v. Goodville Mutual Casualty Company, 403 Pa. 603 (1961), it was held that the words, "arising out of the use of a motor vehicle", mean causally connected with its use. See also Morris v. American Liability & Surety Company, 322 Pa. 91 (1936). Cases are collected in 89 ALR 2d 150, supplementing 154 ALR 1096.

[3] "Unloading" and "delivery" are considered synonymous terms.

In the light of these decisions, it is obvious that the words "loading and unloading" do not pertain to the present factual situation. The complaint of Hartung's executrix against plaintiff averred that the box in question had been "negligently installed" by plaintiff.[4] Plaintiff did not "load" the box upon Hartung's truck in the sense that this word is used in the exclusionary clause of defendant's policy. The box was placed on Hartung's truck for his purposes, not for delivery to some third party. "An accident, in order to be covered by the 'loading and unloading' clause, must not only have occurred *during the process of loading or unloading* but must also be causally connected with such act of loading or unloading": 7 Am. Jur. 2d, Automobile Insurance 397, §90. (Italics supplied.)

Hartung was killed not during the loading or unloading of the refrigerated box, nor as a result of something that was causally connected to loading or unloading, as those terms are used in insurance contracts, but at a

---

"In Pennsylvania the act of delivery of property is a part of the unloading process within the meaning of the unloading clause in an automobile liability policy. . . .": Kaufman v. Liberty Mutual Insurance Company, 160 F. Supp. 923, 928 (1958).

[4] At the hearing in the instant matter, the following words of description were used:

"By Mr. Hunn:

"Q. At that time, was the box placed on his truck?

"A. Yes.

"Q. Where did the installation of the box take place?

"A. At our place of business there . . .

"By Mr. Pugh:

"Q. How was this box placed on his truck?

"A. It was slit [sic] on his truck. The tailgate was closed with locks.

"Q. Did your employees load the box on his truck?

"A. I did myself.

"Q. You loaded the box yourself on the truck?

"A. I did myself.

"Q. You loaded the box yourself on the truck?

"A. Yes": Notes of Testimony 8-10.

later time, and according to the allegation in the suit by Hartung's executrix, as a result of the way in which the box was installed.

It is also obvious that Hartung's death did not result from the "use" of his truck as that term in plaintiff's insurance policy must be construed. In the first place, plaintiff did not use the truck at all. If plaintiff was negligent, his negligent act consisted of the method in which he secured the refrigerated box. This, however, was not a factor in bringing about the accident, as it would have been, for example, if the box had been jostled off the truck as it was being normally driven and had landed on someone. In other words, plaintiff's alleged negligence did not cause, nor help to cause, the accident; it only made the results more serious. Plaintiff's alleged negligence was only a factor in so far as *damages* were concerned. Had plaintiff not been negligent, Hartung may not have been killed, but there still would have been an accident.

In Manufacturers Casualty Insurance Company v. Goodville Mutual Casualty Company, 403 Pa. 603 (1961), the insuring agreement contained the phrase "arising out of the use" of a motor vehicle. The words "arising out of" were held to be broad, general and comprehensive, and the court ruled that they covered an event which would not have occurred had there been no use of the vehicle in question. Such words are not found in the instant policy. Moreover, we are dealing with an exclusionary clause and not an insuring agreement. When such a clause is construed against the insurance company, as it must be where there is any ambiguity, it narrows the meaning to be attributed to the words in question. Had Harleysville desired to exclude from coverage the negligent installation of equipment by plaintiff on motor vehicles, it could have and should have so stated in the policy issued to him. Of course, had it done so in unequivocal words, it is more

than likely that Styer would have gone elsewhere for coverage. One who made his living installing items of equipment on trucks might have second thoughts about a policy of insurance that excluded liability protection once the vehicle was turned over to its owner.

We believe that the exclusionary clause was not intended to bar coverage under the circumstances of this case, and that the trial judge erred to find that it did.

II. COVERAGE UNDER THE COMPREHENSIVE-GENERAL ENDORSEMENT

Although the conclusion to which we have just referred makes our decision obvious, there is one further point that warrants discussion.

The policy in question contains a rider headed: "Comprehensive General—Comprehensive General—Automobile — Manufacturers' and Contractors' — Owners', Landlords' and Tenants': Liability: Individual As Named Insured"

It provides, "It is agreed that:

"1. The policy does not apply to any business pursuits of an insured, except (a) in connection with the conduct of a business of which the named insured is the sole owner and (b) activities in such pursuits which are ordinarily incident to non-business pursuits".

The rider then contains amendments to the insuring agreements, exclusions and conditions which plainly broaden the coverage for the insured.

At the time of the hearing in this matter, one of Harleysville's underwriting supervisors testified that this rider which is headed, "Liability", "Comprehensive General . . .", "Individual As Named Insured" applied only to plaintiff's business pursuits, which are ordinarily incident to nonbusiness pursuits. Harleysville admits that if the accident which claimed Hartung's life had occurred as the result of one of Styer's

business pursuits, which was ordinarily incident to a nonbusiness pursuit, that he would have been covered under its insurance policy.

What is a business pursuit which is "ordinarily incident to nonbusiness pursuits"?

It is contended by Harleysville that golfing, for example, is ordinarily a nonbusiness activity, but that a business man might take a customer golfing, and that in the course of doing so incur liability through negligence. It is to this type of endeavor, and this type only, that this rider applies. Thus, that which is called "comprehensive" and "general" as it applies to "manufacturers and contractors", where the individual is the named insured, turns out to be neither comprehensive nor general, but limited and restricted, applicable to business lunches, business golf dates, and the like.

Harleysville did not define the tantalizing phrase, "activities in such pursuits which are ordinarily incident to nonbusiness pursuits", and without the explanation offered at trial, we would still be puzzled about it. However, we do have some idea what "comprehensive" and "general" mean and these terms were set forth in large letters at the top of the page. This is plainly an instance where in large, prominent letters, an impression of broad coverage is created, and thereafter, the insurance company contends that a vague, obscure, crafty phrase should be interpreted to limit coverage to an unusual factual circumstance.

In Sykes v. Nationwide Mutual Insurance Company, 413 Pa. 640 (1964), Justice Musmanno observed:

"This paragraph would most assuredly never take a prize in a school of expression for clear and crystalline prose. Ambiguity runs through it like ink poured into a fishbowl, clouding the identity of its swimming occupants. . . .

". . . Aside from the morality involved in permitting ambiguous language to entice insurance buyers,

only to drop them into a pit of non-recoverability when claims are made under the policy, the insurance company cannot maintain its position because of the law which specifically states that where ambiguity clouds interpretation the contract in controversy must be interpreted against its authors. The person who writes with ink which spreads and simultaneously produces two conflicting versions of the same proposition cannot complain if the person affected by both propositions chooses to accept that which is more helpful to him and which is against the interests of the contract writer": pages 642-43.

We believe that broad liability coverage is provided under the terms of the "comprehensive", "general" endorsement sold by Harleysville to plaintiff. If such policies are to be limited to business lunches and golf dates, a suitable heading should be devised to make this intent clear.

And now, September 7, 1965, the verdict entered on February 17, 1965, in favor of defendant is set aside, and judgment is awarded to plaintiff in the amount of $2,032, with interest from May 10, 1963.